Freeman, J.,
delivered the opinion of the court.
The prisoner was indicted in 1865 for the murder of "William Cheek. He was tried in 1873, by a jury of Bed-ford county, convicted of murder in the first degree, and *312 sentence of death passed on him, from which he appeals in error to this court.
Several questions have been urged before us in argument as the basis for reversal of the verdict and judgment of the court below, which we proceed to- notice:
First. It appears from the record that the killing took place in 'Bedford county, Tennessee, about the 14-th of January, 1865. .Defendant on the trial filed several pleas, one in form in abatement, the others in bar, all of which, however, allege substantially the same matters of defense. These pleas were stricken out by the court on motion. The first question to be determined is, was there error in the action of the court on these pleas? Two propositions make up the substance of these pleas:
1. At the time of the commission of the supposed offense, a civil Avar existed, Tennessee being one of the Confederate States, and that the defendant Avas in the military service of the United States, and only subject to be punished under the articles of Avar for the government of the army of the United States. The fact in aid of this view is stated that Tennessee was, at the time; in the military occupation of the Federal forces, and under a military governor appointed by the President of the United States, as commander-in-chief of the aimy. The second proposition is, that by virtue of the military occupation of the state, all cíaúI laws of the state were suspended, except so far as permitted to exist by the occupying conquerors, and, therefore, no- law against which the offense- could have been committed, except the law of the United States as contained in the articles of war. As to- the first question, we do not deem it necessary to- go into- a discussion of it at length; suffice it to say, that the Unted States never claimed or possessed the- poAver to punish an offense against the law of any state; as such, or to enforce- the criminal laws of the state. On this subject the two governments are as distinct' •and separate in their spheres of action as if they had no *313 link of connection between them, and no federal relation existed. See the general question reviewed at length in the case of The State v. Rankin, 4 Cold., 147.
As to the second question, we need but say that the position assumed that all the laws of the State of Tennessee were suspended so that murder, rape, arson, and all the catalogue of crimes might have been committed with impunity during the period, subject only to punishment by the military authorities of the United States, is one not sustained, so far as we are aware, by any authority either of text notice or adjudication. We do not think it demands at our hands any elaborate discussion. No laws of the state, applicable to its civil polity or administration of its domestic affairs were ever suspended by virtue of the military occupation of the state, nor pretended to be by virtue of such authority. The act of 1863, punishing rape, arson, and other offenses, when committed by persons in the military service of the United States, was simply a regulation of the United States for the government of her armies, but was not intended to interfere with the action of the courts of the state to enforce her own laws independently against all who might offend against them. This offense having been committed in one of the counties of the state, within its jurisdiction against one of her citizens, and being a private offense, not an act done as a soldier in the discharge of his duty, but one of personal revenge, the courts of the state unquestionably had jurisdiction to try and punish the offense.
We proceed now to examine the questions presented and insisted on as occurring during the trial, for reversal of the judgment. First, it is said the court should have granted a continuance on the affidavit, and amended affidavit presented by the prisonrer for this purpose. It will be necessary to see the facts of the case in order to judge the bearing of the statements of the affidavit on the question presented. It appears that in January, 1865, the deceased had *314 gone to a stillhouse in Bedford county, for the purpose of selling coni to the proprietors; that while there, some time after the middle of the day, defendant came in; that he had not been there very long before he discovered that the horse rode by the deceased had .a brand of U. S. upon him. Pie went into the house and inquired who had ridden the horse, when defendant told him he had; that he had purchased the horse, which seems to have been an old, worn-out animal, from a negro for $12. Thereupon the prisoner said he must have the horse; that he had authority from the Federal General, Milroy, to gather up all the horses thus branded. Deceased said if he had such authority he could take the horse. It does not clearly appear whether any such authority was shown or not, but, at any rate, the deceased was so far satisfied that he gave up the horse after first offering to give security that he would deliver him the next day if defendant would let him ride the horse home, which was refused. Soon after this, deceased, after depositing his saddle in the care of the owners of the establishment, left on foot, purposing to go to the house of one Frank Craig, who seemed to' be his acquaintance. The prisoner remained about the stillhouse until late in the evening, when it was discovered that his own horse, which had been hitched to a stake driven in a stump, had escaped or was missing. Pie thereupon charged that deceased had stolen his horse, and threatened if he caught him with his horse lie would kill him. Parties present told him that he was mistaken, that his horse had got away himself — had not been taken by the deceased; but he persisted in his own view of the matter, that deceased had taken it, and that if so he would kill him. It is proper to say that in the dispute about taking the first horse, defendant had abused deceased; told him that he was a thief — had been whipped in Missouri for stealing corn. After missing his horse, defendant and one Forbes started on the track of the horse, and went, perhaps, a ■ mile, to the house of *315 another man, in the search. At this point Forbes left and went back to his home near the stillliouse, while defendant forced, or at any rate, pressed the. party at whose house he was, much against his will, to go with him toward Oraig’s to. show him the way. This party did go- on as far as the next neighbor’s, Air. Damon, who then, in turn, was compelled to go on to Craig’s, where the killing was done.
The proof in the record shows that defendant threatened, if deceased had taken his horse, that he would kill him, and continued these threats, assuming all the time, as a fact, that his horse had been stolen by deceased, until he reached Craig’s house. The affidavit to which we have referred was for a continuance on the ground of the absence of tliis man Forbes, who first started with defendant in search of the horse. It states that Forbes told defendant that he had no doubt that Cheek, the deceased, had his horse. The affidavit went on the idea that it was important to show by Forbes that he was simply hunting for his horse; that he believed from the statements of Forbes that Cheek had taken his horse and gone to Craig’s, and his purpose was to get his horse — not murder — in following after deceased, and that he acted under the advice and direction of Forbes in going to Oraig’s. This testimony was certainly material in the case to' show the purpose to have been to get his horse, which he was. informed Tad been stolen from him, and the grounds of that belief, that he acted bona fide under this belief. These facts might have had some important bearing on the question whether the party acted under the instigation growing out of the bona fide belief that deceased had stolen his horse, and not from a cool purpose; and that the design to. kill thus formed under passion from this instigating cause, continued to be supported by the same cause of instigation up to the time of the shooting, thus serving to aid in a defense reducing the offense from murder in the first degree to murder in the second degree, or, at any rate, showing cir *316 cumstances of mitigation on which the jury might well have recommended the party to mercy, or reduced the penalty from death to imprisonment for life. We do not say such would have been the result of such testimony, 'but it wTas competent to- go before the jury to be- weighed by them in connection with all the circumstances of the case, in reference to the question of the degree of the crime, and measure o-f punishment. This being so, the only question left is, whether sufficient excuse for the failure to have Forbes present is given in the amended affidavit. The first affidavit contained matter in reference to a witness named Champ, and was deemed sufficient by the court for a continuance, but the state agreed, in order to avoid this, not to examine Champ. Thereupon an amended affidavit ■was filed as to- Forbes-, giving the reasons why he was not summoned. They were substantially as follows: • That Forbes formerly lived in Bedford eo-unty, but had, in fact, moved from that county before the previous term of the court, and his residence was unknown to defendant and his counsel; that he did not disclose this fact to the attorney who adopted the first affidavit and who himself did not know of the fact of removal. H-e also stated that he did not then know where Forbes lived, nor could he learn definitely before making the former affidavit. Btis attorney, however, since writing the first affidavit of the day before, had learned that he lived in Grundy, Franklin or Coffee county, and he expects he can have his -testimony at the next term of the court. The court then inquired how long since defendant had been re-arrested, he having escaped from jail, learned that he had been recommitted in January, before the trial in December; held, in view of this, that the affidavit was insufficient, evidently on the ground of want of diligence in not ascertaining where the witness was, and making efforts to have the party present for the trial. As we have seen, the prisoner had been confined in jail during all this period; his counsel did not know of the *317 fact of removal of the witness from Bedford county. An additional circumstance should be stated in this connection, that in the deathbed statement of the deceased, he is asked if he had stolen the horse, and replied m>, that he knew nothing in the world about the horse. It is equally evident from all the proof, that the defendant acted under the belief, either from the facts before him, or from the statements made to him, that Oheek had taken his horse, and followed him under this belief. While it is true there is an apparent want of, diligence in not having this witness subpoenaed, yet the fact must be taken into consideration that the party was in jail and had no opportunity to make any inquiries as to the residence of the witness, and even after his counsel’s attention had been called to the fact of 'removal, he was unable to ascertain to which county the witness had removed. In view of these facts, and the further fact that the witness [defendant] had been absent from the county fox several years, consequently had not the means of knowing the changes of residence as if he had been in the county, we think the affidavit presented a state of facts in a case, involving life, where the court has 'not exercised a sound legal discretion in refusing the continuance, and that the ends of justice and fairness toward the prisoner demand that he should have had the benefit of the testimony of Forbes, to be weighed 'for what it was worth, in mitigation of the heinous offense with which he is charged.
Bet the case be reversed, and remanded for a new trial.